Next case on this morning's docket is the People's State of Illinois v. Randall v. Ashby and we have Mr. Scott Quinn for the appellant and Jennifer Hamden for the appellant. You may begin. Thank you and please report. My name is Scott Quinn and I am the court-appointed attorney for Randall v. Ashby who was found to be a sexually dangerous person following a trial in White County. And as I was sitting here listening to the first arguments of the morning, I kind of found myself glad that I didn't write out a script or anything beforehand because I always think of what I'm going to say as I sit here absorbing the other arguments and as I was sitting there I was thinking, you know, this case is very reminiscent of a famous case involving our former president Bill Clinton where it comes down to that depends on what your definition of is is. Well this one is that it kind of depends on how you interpret someone's use of the word may. Judge Stanley, when he was announcing his findings to the court, and I very much emphasized this in my brief, he says, I understand that you, meaning Mr. Ashby, you may have a mental disorder that prevents you from controlling yourself and your actions, but I find that you fall under this section of the statute and I declare you sexually dangerous for those reasons stated in court. And I submit to the court that that statement that Mr. Ashby may have a mental disorder that prevents him from controlling his actions isn't enough. But previously the court says that it finds beyond a reasonable doubt that the defendant suffers from a mental disorder. I agree that he did say that and I cited that in my statement of facts. I'm not trying to hide it, but when I'm trying to hide the fact that he said that, I put that in the paragraph immediately prior to that in my brief. But, you know, we can't mistake the fact that he spells out, you know, what his findings are on the court. And he says, I'm a resident of Carmine, a parent, a grandparent, and basically what he says is, what you've done here, what the testimony is, is it's pretty creepy. It creeps me out. And so I find that you're a sexually dangerous person. So you're saying that he contradicted himself. Contradictory, exactly. And so we're not to believe the findings where he did, in fact, say that he had the mental disorder that was requisite under the statute. Well, I mean, it's not that I'm by any means calling him a liar or anything, but whenever we're going to the extreme of putting someone's body away in the Department of Corrections indefinitely, I think we have to be explicit and extremely careful in the words that we use. And when the U.S. Supreme Court tells us what findings are necessary, what are the prerequisites for determining somebody is eligible to be civilly committed indefinitely like this, as the Supreme Court did in the Crane and Hendricks cases, then we've got to be really going on and that's where we follow what the Supreme Court of the United States has told us. And they say that volitional control is a prerequisite. It would be sort of like the judge saying, well, you may have killed this guy, so I'm going to sentence you to murder, or for murder. I think that we have to be really careful with the words we use. And here, the word may is a deal breaker in my mind because it leaves doubt as to what the court's findings actually were. Well, it's certainly confusing for the judge to say one thing and then say it in a different way. The State concedes that there may be confusion and asks that we just reverse and remand. Right. I understand that it's confused, but I think it's beyond confusing because I think that the evidence that was presented at trial is inconsistent with the finding that no one's order existed. Can you tell us how it's inconsistent? Well, because basically the only two witnesses that matter are the two medical experts, Dr. Chapman and Dr. Kodespotty. Dr. Chapman testified that he'd done 133 of these sexually transmitted person evaluations. He clearly articulated that he had an understanding of the law and what the definition of a sexually dangerous person was and what it took to be an SDP and what it took to not be an SDP. He'd also testified that about 75% of the time he found that they were SDP and about 25% of the time they weren't. So he was the expert of experts among the two here. And he clearly articulated that, yeah, I know the definition, and this guy doesn't need the definition because he doesn't have the requisite mental disorder. On the other hand, Dr. Chapman, I mean Dr. Kodespotty testified. She said she'd done four or five, and she couldn't remember if she'd ever found somebody not to be SDP or not before. But then if you read the transcript of her testimony, she doesn't really offer any testimony that really tells us that she has a clear understanding of what the definition is, why somebody is a sexually dangerous person under this particular statute. Did the trial court articulate the basis upon which it relied, which expert it relied upon and the basis for that and differentiated between Kodespotty and Chapman? I don't recall the trial court making that statement. Ms. Angelo, correct me if I'm wrong. I mean that's been a considerable amount of time since I thoroughly studied that part of the transcript. But what I do know is that the testimonies when compared, the testimony of Dr. Chapman versus the testimony of Dr. Kodespotty, when you line them up side by side, they're staggeringly different. And the appearance to me was clear that Dr. Kodespotty, Mr. Ashby, called her honey during the interview a couple times, and it ruffled her feathers and it crossed the line that she didn't think needed to be crossed, and she was awfully racist and he was a sexually dangerous person, but she couldn't really articulate to the court, if you read her testimony, exactly why it is that he had the requisite disorder and the requisite lack of volitional control that are required. And so then the other ten witnesses at the trial are what public defender Jerry Kreisel, who handled the trial at the trial level, characterizes the torture pitchfork witnesses that would come out and say, yeah, he was staring at my kid as she was coming out of kindergarten class, or yeah, he was staring at these other kids while he was in the Walmart parking lot. And that is admittedly creepy, but as Mr. Kreisel pointed out at trial, it wasn't an act that was necessarily relevant. There was nothing illegal that was committed by him doing any of those acts, and so he objected to each of the, you know, all the testimony. Each time it was denied, the objection, and the testimony was allowed, but the sum total of the value of that testimony was extremely low because they weren't really testifying to any illegal acts on the part of my client, Mr. Ashby. Mr. Kreisel, one second. Well, I recall that it appeared that the defendant had given somewhat different testimony or different statements to the two doctors, and that when Dr. Chapman was advised of information that was apparently given to the other doctor and not he, he said that it would have affected his conclusion regarding, you know, his propensities and that he would have seriously considered pedophilia. Is that correct? You have correctly stated, you know, what the testimony is, and I think you summed it up well, that in reality, Frank Lashley was much more open in his interview with Dr. Cotas-Body, and he was less cooperative with Dr. Chapman. But that's kind of a what-if scenario is what I, the way I took that. Well, if I had this piece of information or if I had that piece of information, I might have come to a different conclusion, but he didn't have that, so his testimony, you know, remained that, yeah, he is not a sexually dangerous person. But isn't it valid for the court to consider that? Oh, it's certainly valid for the court to consider that that lessens the integrity of his testimony, but I don't think it completely deflates it or makes it to where the person who could articulate what makes one a sexually dangerous person or the person who could articulate why he didn't think that Randall actually was a sexually dangerous person. I don't think it deflates it to below Dr. Cotas-Body who, in my opinion, at least given my reading of her testimony, wasn't nearly as qualified or nearly as thorough in her announcing of her reasons for declaring him to be a sexually dangerous person. And so it's my position that, yes, Judge Stanley sort of botched things with his statement of, in one paragraph he said, I find you to have this mental disorder, and in the next paragraph, you know, basically in the next body, he said, well, you may have this disorder, but I don't think that Randall Ashby needs to be the one who suffers for the court's lack of thoroughness in announcing the decisions or being completely educated on what the requisite findings were. And as a Monday morning quarterback, I would say that the state's attorney was there in the courtroom and should have stood up and said, Judge, just so we have a clear and clean record and are explicitly clear, you said may here and make the specific finding there. I'm asking you to clarify which it is. Like I said, admittedly, that's a Monday morning quarterback type call on my part, but when we're talking about people's due process rights and whether or not they're going to be confined indefinitely in the Illinois Department of Corrections, I think that we have to err on the side of the defendant appellate and not bend over backwards to let the court's mistake slide through, especially in this case where, yeah, they had a lot of witnesses, but the quality of the testimony was not that great. And the first finding which was explicit about a mental disorder was his finding. The second comment was when he was talking to Mr. Ashby, explaining what he perceived to be the situation. It's not what I want to do, but I find your actions are disturbing. Those aren't findings. Those are just comments. I understand what you're saying, Judge Weston. I'm going to respectfully disagree because as I look at this paragraph that's on page 9 of my brief, which is in the he uses the word find four times in that paragraph, and so I think that he's still announcing his findings. And so I would ask you to take another look at that with that in mind because the state in their briefs try to compare it to a situation where he says, well, he may be slow, but he's thorough. I don't think that's what's happening here, and if you agree that that's what's happening here, well, then I suppose I know where this case is going. But he says in this just one paragraph here, I find that your actions are extremely disturbing. I find that what you've been doing here is very disturbing, and I find that you fall under this section of statutes. And so I think he's still announcing his findings, and they're confusing to the point in which I don't believe that they have, I think it's evidence that the requisite findings were not made as the U.S. Supreme Court directs. If anybody has any further questions, I'd be more than happy to address those. But otherwise, like I told you, I'm unscripted, so I'm going to rely on questions from you. Otherwise, I'll have a seat. Have a seat, and you can give the opportunity to rebut. Ms. Camden. Thank you. Good morning. Jennifer Camden on behalf of the people, and may it please the Court, the Council. First, with regard to the argument about the word may, I first want to address something that I think I heard Justice Huxton say. It's not, Your Honor, that the people are conceding confusion on the question of what the word may means in that statement, or that the people are asking for remand based on the use of the word may. The request for remand under Masterson was based on a separate factual finding of a substantial probability to reoffend. It's the people's position in the answer brief that the word may was used as he said it was, or as speaking to the defendant. And in fact, the full sentence is, or excuse me, the respondent's full sentence is, I understand that you may have a mental disorder that prevents you from controlling yourself over your actions, but I find that you fall under this section of the statute. And this was, as the people point out in the answer brief, made after an unambiguous and explicit finding of fact that the respondent did have a mental disorder, and as you just saw, it was followed by another unambiguous statement that respondent fell under the statute, i.e. under the definition of sexually dangerous person. I'd also note that this argument is forfeited by the respondent. It wasn't made in the respondent's post-trial motion, and neither did the respondent file a motion for clarification, which he also could have done. Does the Court have any questions on this portion of the respondent's argument? So you just want it to be reversed so you can make a specific factual finding, correct? Not as to the use of the word may. The people's argument is that this Court ought to find that the judge did make a ruling, that there did make a finding of fact that there was a mental disorder, and further, that there was evidence sufficient from which the trial court could have made that ruling, but then also to remand for a specific factual finding on the question of whether there was a substantial probability for re-offense, and the reason for that is that the Illinois Supreme Court required in the case Masterson that trial courts make that finding. And that was not elicited. That's precisely so. The people and the respondent agree on that point, but disagree about what this Court ought to do about it. It's the respondent's position, as set out on page 4 of his reply brief, that remand for a specific factual finding on that point is inappropriate because there was insufficient evidence from which the trial court could have found a substantial probability to re-offend. But the problems with that position are these, that first, that's a determination for the trial court to make in the first instance. This court can't consider the sufficiency of the evidence to support a fact that the trial court never found or considered one way or the other. Now, as a side point, I'd note that it's the people's position that the record, as it exists now, would be sufficient to support that factual finding, that the trial court's finding of propensity to commit these acts, plus a finding of a lack of volitional control over one's ability to control committing these acts, equals a substantial probability for re-offense in the event that the respondent is not confined. Now, under Masterson, the Illinois Supreme Court stated in Masterson that the additional factual finding that's required under Crane, that there is a substantial probability for re-offense, is just a requirement that the trial court make explicit on the record what had previously been implicit through the required factual findings, that there's a lack of volitional control plus a propensity for re-offense. But really, all that's beside the point. What's important here is that this is a determination for the trial court to make in the first instance. Separately, this court shouldn't engage in an inquiry about the sufficiency of the evidence to support this factual finding that the trial court didn't enter, because upon remand, the trial court would have the discretion to take additional evidence if he found it lacking in that respect. And so, any consideration about the sufficiency of the evidence would be premature at this point. Our statute, when it was amended, didn't include the language, substantially probable. That's precisely so, Your Honor, and I can't explain it. Other than to say that that is what Masterson and cases interpreting it seem to require. And it appears in Masterson that the court read into, that was an Illinois Supreme Court decision from 2003, and the court borrowed, read into the statute, some of the language from the Sexually Violent Persons Commitment Act as regards to the definition of mental disorder, and also the language regarding a substantial probability for re-offense. Both of those concepts exist in the SBPCA, but the legislature only codified half of it, and I can't account for it, Your Honor. Does the court have any questions about this portion of the argument or about the relief that people are seeking? No, I don't think we do. Okay. Well then, I'll move on to discuss the sufficiency of the evidence to support the trial judge's finding that there was a mental disorder affecting the respondent's volitional control. Now, under People v. Hancock, which is cited in the People's Brief, a finding of lack of volitional control should be supported by a diagnosis of pedophilia and evidence of criminal offenses conducted in support of these uncontrolled urges. And here, there was evidence of both of these factors. First, as to evidence of criminal offenses, that's easy enough. There was evidence that the respondent had four previous convictions related to his mental disorder, first for indecent liberties with a child, for aggravated kidnapping, for unlawful communication with a child in a public park, and for unlawful loitering near a park. And I'd point out that these convictions are particularly probative given the facts. First, that the aggravated kidnapping of a seven-year-old girl occurred three days after the respondent had been released on parole for indecent liberties with a child. And further, that these indecent liberties with a child occurred in a public park and that his two latter convictions were for hanging around public parks. This is a man, in other words, who cannot control himself. Furthermore, as to the diagnosis of pedophilia, Your Honor, the judge did articulate, the trial judge did articulate his reasons for crediting Dr. Khattabadi's opinion over Dr. Chapman's opinion as to whether or not the respondent had pedophilia. The record citation is R-299 to R-302. The trial judge discusses the difference between, as Justice Chapman pointed out, the basis for Dr. Khattabadi's opinion and the basis for Dr. Chapman's opinion. That is, the difference in the interviews that the respondent gave these two expert witnesses. He told, and all of this is memorialized in the judge's analysis, he told Dr. Chapman that he had no interest in or experience with pre-adolescent girls, period. He told Dr. Khattabadi, however, that he was interested and did like to look at pre-adolescent girls. Furthermore, what he liked about them was that he believed that if he were to have intercourse with them, that they would be, quote, tight. And further, that he had, in fact, had sexual contact with four little girls between the ages of 10 and 14, one of whom was his own daughter, another one of whom he lured from a public park with cotton candy. And a third, a 10-year-old, who he rationalized to Dr. Khattabadi that it was okay that he had molested her because she'd previously been molested by somebody else. And as you point out, Justice Chapman, Dr. Chapman did say that, on cross-examination, that had he known these things, he would have seriously considered pedophilia. Now, as to the difference in the resumes of these two psychiatrists, which a respondent argues is probative in the briefs and then also here today, the question of credibility of the two expert witnesses is one to be resolved by the judge. And further, the reason that Dr. Khattabadi had had fewer Illinois Sexually Dangerous Persons Act interviews on her resume was that she'd spent 21 of her 25 years of practice in Ohio, where clearly she'd not had the occasion to consider the Illinois Sexually Dangerous Persons Act. So the judge was not unreasonable in crediting Dr. Khattabadi's analysis over Dr. Chapman's. And then finally, as a housekeeping matter, the people would like to point out that in the respondent's reply brief, at pages four through six, the respondent argues that these ten witnesses from the community, as opposed to the two police officers' testimony, was irrelevant and should not have been allowed. I'd like to point out that this argument was not made in the opening brief, and that further, even in the reply brief, it's not supported by any legal argument or citation to authority. It's just a bare assertion. And furthermore, it's a meritless argument. Number one, the testimony is not required to be criminal, only probative. Sorry, the testimony of these ten witnesses was not required to be probative of the respondent's prior criminal acts, only relevant to the overall inquiry of sexual dangerousness. And of course, this testimony illustrated the respondent's propensity, predisposition to commit these acts. And also, Dr. Khattabadi tied all of these witnesses' testimony together when discussing her diagnosis of pedophilia, that is, that people with pedophilia engage in what she called grooming, that is, seeking out children, which is what these witnesses testified to. Furthermore, some of their testimony actually did illustrate crimes that he had committed, i.e., his driving around schools, which he was prohibited as a prior sex offender from doing. Oh, and as a final note, I'll point out that the reply brief drops the respondent's argument that the judge was required to recite the definition of mental disorder when making his factual findings. This was an argument that the respondent had made in the opening brief that the people responded to in the answer brief and that is not remade or responded to in the reply brief. Okay. Was there an obligation, a requirement that that be addressed in the reply brief? Well, I just found it curious that there was no response to the people's dealing with that in the answer brief. People stand on their argument under Varner and Cain that there is no such requirement there. If there are no further questions. Thank you, Ms. Campbell. Mr. Quinn, do you have a rebuttal? Thank you. First off, with regard to that last issue, since it's fresh to my mind, there's no obligation to respond in the reply brief. In fact, I don't think I'm obligated to file a reply brief, so I don't think that any argument was waived based on not addressing something raised in the state's brief. The driving around schools, she mentioned that. The school was located around a main thoroughfare in a tiny town, and the evidence that was elicited at trial was that this woman who was testifying, which I don't recall which one it was, I think it was Ms. Browning, hailed him down on the middle of the street. She's the reason he was stopped there. He was just traveling on that road. And so I don't think that any of the evidence of those that I call the ten valueless witnesses, I don't think that there was any evidence of him committing any illegal acts in any of those ten witnesses' testimony. Now, the main point of the case, back to the issue of does May negate the findings or confuse the findings so much that we need to let Mr. Ashby out or at least let him have a new trial? I'm submitting that the Hendricks case and the Crane case don't really give a lot of wiggle room here. Hendricks set out what was required in these cases, or in these statutes, that involve civil commitment of sex offenders, and included in that was the requirement that the state show the person lacked volitional control. Now, Crane later clarified that. He said it's not a total lack of volitional control that's required, but clearly, if Reed Crane, clearly some volitional control was required for the civil commitment statute to be valid. And so we have our volitional control requirements in the SBP and SBP statutes, and that will be an argument for Ms. Camden and I tomorrow about whether or not those are too close to be considered different or the same. But anyway, in any event, the statement that you may have a mental disorder that prevents you from controlling yourself, that's either in danger or close, and I'd say beyond on the issue of are they making a specific finding regarding that lack of volitional control. That lack of volitional control has to exist if they're going to commit him as an SBP. And it's my submission to the court that in light of the judge's statements, you may have that mental disorder. It's not clear, and the due process rights require that Mr. Ashby and we all are afforded due process rights require that the court make an explicit finding that that volitional control, that lack of volitional control exists. And so I think that unless we want to set a dangerous precedent allowing people to be committed without that lack of volitional control or a specific finding of that lack of volitional control that the highest court of land tells us is required, it needs to be remanded or it needs to be let out. You agree that it should be remanded?  I mean, in my prayer for relief, I think that it needs to just be reversed and that he should be released immediately. But at the very least, it needs to be remanded because there are clearly, I say one, and the state cites a different mistake made by the judge in his findings, and I think that the water's too muddy where Randall Ashby's concerned, and he's being confined indefinitely in the Illinois Department of Corrections, and that should not stand. And my position is the court should just overturn and let him out. But at the very least, the case needs to be remanded. Thank you. Thank you, Mr. Quinn.